# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00538-CR

**Brandon Threet, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT
### NO. 01-1096-K368, HONORABLE BURT CARNES, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Acquitted of murder, Brandon Threet appeals his conviction for the lesser-included offense of manslaughter. Appellant contends the evidence is factually insufficient to support his conviction. Upon a review of the evidence, we conclude the evidence is factually sufficient and we affirm the district court=s judgment.

## BACKGROUND

Appellant encountered Terence McArdle at a late-night beer-drinking and sports-watching party on October 6, 2001, at the home of Eric Stahl in the Anderson Mill area of Williamson County. Stahl=s parents were out of town. Appellant and McArdle, both college students, did not know each other

before the night of the party. Appellant was nineteen and McArdle had turned eighteen that day. The testimony at trial revealed that both had consumed alcohol that evening.

At one point during the evening, appellant became annoyed with McArdle because McArdle was wearing a pair of ski goggles Ajust to be funny.@ After McArdle, a student of tae kwon do, did a back flip in the living room, bumping a chest with photographs on it, Stahl told him to be careful. Appellant confronted McArdle, telling him that he did not need to be doing flips, that he would break something. The encounter between appellant and McArdle became heated as the two men exchanged profanities. A witness recalled that appellant grabbed the goggles from McArdle=s face and pushed him to the ground. Stahl separated them and another friend took appellant out to the backyard of the house where a number of party-goers had gathered.

Within twenty to forty minutes, another confrontation occurred when appellant and McArdle encountered each other in the backyard. They again exchanged words over the goggles and, after McArdle at first declined to fight, they decided to settle the dispute over possession of the goggles by Atrading licks,@ with McArdle taking the first punch. The Afight@ was captured on videotape by one of the party=s attendees.

McArdle took the first punch, striking appellant in the chest with his fist. Using his full body mass, appellant then struck McArdle in the face, knocking him to the ground. Acknowledging at trial that he was Ajust out of control,@ appellant struck McArdle two or three more times as he lay on the ground. As a bystander attempted to pull appellant away from McArdle, appellant swung at the bystander. Taking

2

three measured steps, appellant, who was wearing hiking boots, then approached McArdle at an angle, kicking McArdle in the head.

Lying unconscious on the ground, McArdle was carried into the house and placed in a chair and then a couch. He was bleeding from his mouth and his breathing was labored. Appellant departed the premises shortly thereafter. McArdle was eventually taken to the Seton Northwest Hospital emergency room and later transferred to Brackenridge Hospital. Dr. John Bedolla testified that, when McArdle arrived at Seton, he had no vital signs, neurological activity, or cardiac activity. Bedolla associated McArdle=s discoloration with prolonged cardiac arrest. At Brackenridge, Dr. Daniel Peterson, a neurosurgeon, determined that McArdle was brain dead. McArdle remained on a ventilator until five days later when he was taken off life support. A Travis County medical examiner, Dr. Vladimir Parungao, performed an autopsy on McArdle=s body. Parungao determined that the cause of death was appellant striking McArdle in the face and kicking him in the head. Appellant was indicted for murder. A jury found appellant guilty of the lesser-included offense of manslaughter, and he was sentenced to twenty years in prison and a fine in the amount of $10,000.

## DISCUSSION

By his sole issue, appellant challenges the factual sufficiency of the evidence to support his conviction for manslaughter. Appellant contends that the evidence is insufficient to support the conclusion that appellant was actually aware of or should have known the risk of death when he fatally kicked McArdle. While he acknowledges that the blows were severe enough to kill McArdle, he urges that he was unaware that they could cause death and is guilty, at most, of criminally negligent homicide.

3

The distinction between manslaughter and criminally negligent homicide is simply one of degree. *Lugo v. State*, 667 S.W.2d 144, 147 (Tex. Crim. App. 1984). A conviction for manslaughter requires a finding that the defendant recklessly caused the decedent=s death. Tex. Pen. Code Ann. ' 19.04(a) (West 2003). Manslaughter is, by definition, an accidental homicide, committed with recklessness. *See Lawson v. State*, 64 S.W.3d 396, 398 (Tex. Crim. App. 2001). AA person acts recklessly, or is reckless, with respect to . . . the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur.@ Tex. Pen. Code Ann. ' 6.03(c) (West 2003). Criminally negligent homicide is a lesser-included offense of manslaughter; a person acts with criminal negligence when he Aought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur.@ *Id.* ' 6.03(d). In *Lewis v. State*, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975), the Texas Court of Criminal Appeals distinguished between the two definitions of intent: AAt the heart of reckless conduct is conscious disregard of the risk created by the actor=s conduct; the key to criminal negligence is found in the failure of the actor to perceive the risk.@ Thus, the issue on appeal is whether the jury could conclude beyond a reasonable doubt that, although the defendant did not intentionally or knowingly kill McArdle, he consciously disregarded a substantial and unjustifiable risk that the result would occur.

In determining the factual sufficiency of the elements of the offense, the reviewing court views all of the evidence in a neutral light. *Johnson v. State*, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). The court reviews the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compares it with the evidence that tends to disprove that fact. *Id.* at 7. The appellate court

4

may find either that the State=s proof of guilt was so obviously weak as to undermine confidence in the jury=s determination, or that the finding of guilt was against the great weight and preponderance of the evidence. *Id*. at 11.

When the defendant proffers contrary evidence, the reviewing court considers whether the proof of guilt, although adequate if taken alone, is greatly outweighed by the defendant=s evidence. *Id*. In conducting its factual sufficiency review, an appellate court reviews the jury=s weighing of the evidence and is authorized to disagree with the jury=s determination. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). The reviewing court, however, does not substitute its judgment for that of the jury and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id*. at 129. The reviewing court may not reverse a jury=s decision simply because it disagrees with the result. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

Appellant acknowledged at trial that his conduct caused McArdle=s death and that there was a serious risk involved in kicking him. The State introduced evidence showing that the head is particularly vulnerable to death or serious bodily injury because of the soft tissue in the head and the nature of the brain. Because the conduct was recorded on a video camera, witnesses at trial testified to the extent of force employed. James Von Debrow, a Ause of force@ expert employed by the Texas Department of Public Safety, testified that the head is one of the most vulnerable parts of the human body, and that the likelihood of serious injury or death resulting from a blow to the head is Aalways great.@ Viewing the videotape, the expert testified that appellant delivered the blow to McArdle=s head from a Abalanced@

position with Avery fast@ speed, allowing him to use Ahis complete body mass, winding up to use all of the force that can possibly apply.@

As others cautioned appellant to back off, appellant continued to swing at the victim. Appellant then lowered his body, taking a Awide-base stance,@ and delivered a fatal kick to McArdle=s head. Debrow described the actions captured on video: AGetting that angle, lowering that body, going to put more speed and more power, more snap, more of a follow-through.@ From viewing the conduct on the video, Debrow concluded that the blows to McArdle=s face and head were intentional and deliberate and likely to result in serious bodily injury or death. Because of the Abalance, speed, the power, [appellant=s] mass, the velocity which he threw the punch, and also the target area that was chosen which was the face,@ Debrow concluded that A[i]t was very clear that he knew what he was doing.@ Appellant was a cornerback on his high school football team and familiar with the use of helmets to protect the head area; the State urged the jury to conclude that appellant was aware of the risks posed from a blow to the head from his own experience and knowledge. Dr. Peterson, the neurosurgeon, also testified that the acts he viewed on the videotape were Aclearly dangerous to human life.@

Appellant testified in his own defense. Because the fight itself lasted only fifteen seconds, appellant testified that he did not perceive the severity of his act or that a kick could inflict such a severe injury. Appellant acknowledged at trial that he realized there was a Aserious risk@ involved in kicking McArdle, but disputed that he was at any time aware of a risk that his conduct could cause death. In describing his involvement in the altercation, appellant testified to the events that transpired when he first encountered McArdle and Stahl in the living room:

6

The first time that I noticed [McArdle's] conduct was when Eric Stahl approached me and said that things are a little bit—getting a little bit out of hand, because he's had previous parties over there, which he has been in trouble with the cops. And he approached me saying that they were getting out of hand. And we noticed Terence was stumbling around a little bit, just like there was other drunk people there doing the same.

* * *

What happened when me and Eric were talking is that he—me and him were talking. And I took it onto myself, yes, after we talked to go up to Terence and tell him to calm down because Eric picked him out, that he was making the most like ruckus out of the people.

* * *

I did not witness a back flip. I witnessed the—after he did the back flip, after he ran into the dresser and knocked the pictures over.

* * *

After I saw that is when Eric got a little more upset and told Terence to calm down. I saw Terence right at the chair. We kind of met in the middle. He was walking away from the thing that he ran into. And I got up off the couch and approached Terence and said, "Would you please"—or, "Calm down. Chill out. Sit down." You know, "Please take off the goggles because obviously they are impairing you even more because you already can't walk."

Appellant explained that he asked McArdle to take off the goggles because "it would help him calm down."

When he later encountered McArdle in the backyard with the goggles still on, appellant came up with the idea to "trade licks":

When I came up with that idea, it was more along the lines of me accepting he was going to wear the goggles regardless what happened. And that was just sort of—I don't know—joking around. It was, "All right. You can wear the goggles. Let's just exchange—you hit me, and I'll hit you. And it will be over with."

7

When McArdle hit appellant harder than he expected, appellant responded by hitting him in the face and became Aout of control where I had no sense of what I was doing and what was going on around me.@ Appellant testified that he continued to hit and then kick McArdle because A[t]he only thing that was going through my mind was maybe him getting back up and retaliating because he was getting back up.@ Later that early morning when appellant learned McArdle was in serious condition at the hospital and the police wanted to speak with him, appellant told a police officer, who recorded the conversation:

> We were all over at a buddy=s house drinking. And before you know it, we were in the backyard. AndCand there was me and another guy, and we were both been drinking. AndCand he hit me, and then I hit him. And I don=t know. I ain=t never been in a fight, soCand then I hit him. And all I remember is he went to the ground.

When appellant learned McArdle had died, he wrote a letter to McArdle=s family apologizing that heAdid not mean at all to hurt your son,@ and did not dislike him or have a grudge against him. Because of the brevity of the fight and appellant=s remorsefulness when he learned McArdle was seriously injured, he argues that he did not perceive the risk of injury and did not possess the required awareness to sustain a manslaughter conviction.

Viewing this evidence in a neutral light, we conclude that the jury could have reasonably concluded that appellant engaged in reckless conduct that caused McArdle=s death and that he perceived the risk but consciously disregarded the risk that his conduct would cause McArdle=s death. We find that the jury as the trier of fact could have reasonably rejected the appellant=s testimony that he was unaware of the risk of death involved in his conduct. The escalation of the confrontation between the two young

8

menCfrom a heated argument and a physical encounter in the living room to a series of increasingly violent blows in the backyard culminating in the kick to the head, coupled with appellant=s apparent anger and demeanor when he inflicted the blowsCsupports the jury=s conclusion that appellant engaged in reckless conduct that caused McArdle=s death. The State=s proof of guilt is not so obviously weak as to undermine confidence in the jury=s determination, nor is the verdict so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Because the evidence supports the manslaughter conviction, we overrule appellant=s issue.

## CONCLUSION

We affirm the district court=s judgment of conviction.

_____

Jan P. Patterson, Justice

Before Justices Kidd, B. A. Smith and Patterson

Affirmed

Filed:  May 15, 2003

Do Not Publish

9